UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,

    - against -

SEAN PETER,                           17 CR 054 (NRB)
    a/k/a "Huggie,"

                             **MEMORANDUM AND ORDER**

               Defendant.
----------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

      Defendant Sean Peter stands charged in a three-count indictment with (1) conspiracy to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(D); (2) murder through the use of a firearm during and in relation to a narcotics conspiracy, in violation of 18 U.S.C. § 924(j); and (3) possession of a firearm that was brandished and discharged during and in relation to a narcotics conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A)(ii)-(iii). ECF No. 1. Before the Court is Peter's motion to suppress statements that he made to officers of the Teaneck, New Jersey Police Department during a post-arrest, custodial interrogation that was recorded on video. ECF No. 57. Peter argues that the statements were elicited in violation of his rights under the Fifth Amendment and the

dictates of Miranda v. Arizona, 384 U.S. 436 (1966).[1] For the reasons that follow, we deny the suppression motion.

## I. BACKGROUND

At approximately 4:30 a.m. on October 2, 2012, a van carrying Peter and three other individuals arrived at the Holy Name Medical Center in Teaneck, New Jersey ("the hospital"), where Peter sought treatment for a gunshot wound to his right arm. Officers of the Teaneck Police Department, responding to a report of a gunshot wound, arrived at the hospital and interviewed Peter while he was not in custody. The officers subsequently obtained consent to search the van, and in it they discovered a bag containing, inter alia, credit cards and IDs in Peter's name, a large quantity of marijuana, paraphernalia associated with narcotics distribution, $3,674 in cash, and ammunition matching the type found at the scene of a fatal shooting that had occurred in the Bronx, New York a few hours earlier.

In view of the contraband found in the bag, which the officers reasonably connected to Peter, Peter was placed under

---

[1] At the outset, we summarily reject Peter's alternative argument that the statements were elicited in violation of his Sixth Amendment right to counsel. As is well established, the Sixth Amendment "right to counsel does not attach until [a] prosecution is initiated." United States v. Moore, 670 F.3d 222, 233-34 (2d Cir. 2012). At the time of the interrogation at issue, "no formal charging instrument ha[d] yet been filed," and Peter had not appeared "before a judicial officer" or had any "formal accusation [made] against him." Id. at 234. "Accordingly, [Peter's] Sixth Amendment right to counsel had not [yet] attached." Id. at 235. The remainder of this Memorandum and Order analyzes Peter's request for suppression under only the Fifth Amendment.

2

arrest. The officers waited for emergency room staff to complete their treatment of Peter's wound, and when Peter was medically cleared to leave the hospital at approximately 9:30 a.m., the officers transported him to Teaneck Police headquarters, where the interrogation at issue took place.

The interrogation, which was recorded on video, began at approximately 11:11 a.m. and was conducted by Detectives Kevin Brennan and Mark Fisco.[2] In the video, Peter can be seen with his shirt off and his right arm bandaged around the area of the gunshot wound. Detective Brennan began the interview by acknowledging Peter's condition:

| | |
|---|---|
| **BRENNAN**: | You all right, bud? |
| **PETER**: | I'm all right. |
| **BRENNAN**: | I met you in the hospital. Kevin Brennan. |

After Detective Fisco introduced himself, Brennan continued:

| | |
|---|---|
| **BRENNAN**: | All right. You've got to be cold and in some pain, so we want to try to get through this, you know, quickly with you. Um, like I said, my name is Detective Kevin Brennan, to my right is Detective Mark Fisco. . . . Uh, for the record can I have your name? |

Over the ensuing minute, Brennan elicited Peter's pedigree information. He then proceeded to read Peter his Miranda rights and to provide Peter with a standard Miranda warning form. The

---

[2] The description of the interrogation provided in this Memorandum and Order reflect the Court's independent assessment of the video, which was filed as an exhibit to Peter's Memorandum of Law. ECF No. 58, Ex. 1.

3

form, titled MIRANDA WARNING, listed the five familiar Miranda rights and included, after each right, the question "Do you understand that right?" along with a space for an interviewee to write either "yes" or "no" and his initials. As Brennan read Peter his rights, he had Peter follow along on the form and instructed Peter on how to complete it. The exchange played out as follows:

| | |
|---|---|
| **BRENNAN**: | Okay. Um, I'm just gonna read you your rights. Um, prior to custodial interrogation you must be advised of your Constitutional rights. |
| | Um, you have the right to remain silent. Do you understand that right? |
| **PETER**: | Mm-hmm. |
| **BRENNAN**: | Okay, you write yes and then initial next to that. |
| **PETER**: | [Peter writes "yes" and his initials next to the first right] |
| **BRENNAN**: | Anything you say can and will be . . . used against you in the court of law. Do you understand that right? |
| **PETER**: | [inaudible] |
| **BRENNAN**: | Say--you've got to say yes or no. |
| **PETER**: | Yes. |
| | [Peter writes "yes" and his initials next to the second right] |
| **BRENNAN**: | Okay. You have the right to talk to an attorney and have him present with you while you are being questioned. Do you understand that right? |

| | |
|---|---|
| **PETER**: | Yes. |

[Peter writes "yes" and his initials next to the third right]

| | |
|---|---|
| **BRENNAN**: | If you cannot afford to hire an attorney, one will be appointed to represent you prior to any questioning, if you so desire. Do you understand that right? |
| **PETER**: | Yes. |

[Peter writes "yes" and his initials next to the fourth right]

| | |
|---|---|
| **BRENNAN**: | You have the continuing right to exercise these rights and not to answer any questions or make any statements at the time during the questioning. Do you understand that right? |
| **PETER**: | Yes. |

[Peter writes "yes" and his initials next to the fifth right]

| | |
|---|---|
| **BRENNAN**: | Okay. Uh, print your name. |

[Brennan points to a blank line in a statement at the bottom of the form; Peter prints his name on that line; Brennan then points to the statement]

And this just says, "I, Sean Peter, have had the opportunity to read this statement of my rights, and that has also been read aloud to me. I understand what my rights are and I am willing to make a statement and answer questions without the presence of an attorney. No promises or threats have been made to me, and no pressure or coercion of any kind has been used against me. I have been advised of the

|              |                                                          |
|--------------|----------------------------------------------------------|
|              | summons, complaint, or arrest warrant that has been issued against me." |
|              | We don't have any complaints at this time, okay? We're still trying to determine that, that's why we want to get your side of the story, figure out what happened today. Um, you know, obviously you showed up at [the] hospital with a gunshot wound and, um, you know, something . . . Oh, I'm sorry. You've got to sign this. |
| **PETER**:   | [Peter begins to sign the statement]                     |
| **BRENNAN**: | Do you understand all this?                              |
| **PETER**:   | [Peter finishes signing the statement]                   |
| **BRENNAN**: | Okay, um, let me see the pen.                            |
|              | [Brennan signs the "Witness" line next to Peter's signature] |
| **PETER**:   | So when can I see an attorney and the judge?[3]          |

---

[3] Peter has not argued that this question amounted to an invocation of his right to counsel. Accordingly, that argument has been waived. In any event, we would reject that argument on the merits.

A suspect wishing to invoke his right to counsel must do so unambiguously. See Davis v. United States, 512 U.S. 452, 459 (1994). It is not enough for a suspect merely to "reference [] an attorney"; his statement must, under the circumstances, be reasonably understood as "a *request* for an attorney." Id. (emphasis added). The circumstances here were insufficient to put "a reasonable officer" on notice that Peter was requesting an attorney.

Peter asked this question seconds after signing a statement declaring his intention to answer questions without an attorney present. A reasonable officer would have therefore understood Peter as, at most, asking a general question about when he would see an attorney if he *did* request to do so. Court's routinely reject the contention that such inquiries into the operation of the right to counsel constitute invocations of that right. See, e.g., United States v. Lux, 905 F.2d 1379, 1382 (10th Cir. 1990) (no invocation where defendant asked "how long it would take" for her to see a lawyer if she chose to do so); United States v. Lights, 208 F. Supp. 3d 568, 572 (S.D.N.Y. 2016) (no invocation where defendant asked "[c]an I call my attorney?" and context "show[ed] that, at most, [the defendant was] indicat[ing] that he would like to call an attorney at some point in the future"); United States v. Mejorado, No. 14 Cr. 930 (WQH), 2015 WL 106378, at *7 (S.D. Cal. Jan. 7, 2015) (no invocation where defendant asked "when can I

| | |
|---|---|
| **FISCO**: | [Fisco signs the second "Witness" line next to Peter's signature] |
| | Well, let's just finish the date and say it's October 2nd. |
| **BRENNAN**: | At 11: 11. |
| **PETER**: | I have to write it? |
| **FISCO**: | Yeah, man. |
| | [Peter fills in the date and time fields on the Miranda waiver form] |

By the end of this colloquy, Peter had orally affirmed his understanding of each Miranda right; he had memorialized that understanding by writing--for each right--"yes" and his initials in response to the question "Do you understand that right?"; and he had signed a statement, which had been read aloud to him, confirming that he had been read his rights, that he had read those rights himself, that he understood those rights, and that, having been faced with no promises, threats, pressure or coercion, he was willing to answer questions without an attorney present. The detectives then interrogated Peter for roughly an hour, during which time he made certain statements that the Government wishes to introduce at trial--namely, statements linking Peter to the contraband found in the van.

---

see a lawyer?" and "when can I get a lawyer?" but continued to respond to questions); cf. Diaz v. Senkowski, 76 F.3d 61, 63-64 (2d Cir. 1996) (no invocation where defendant asked "[d]o you think I need a lawyer?"); United States v. Scarpa, 897 F.2d 63, 70 (2d Cir. 1990) (no invocation where defendant agreed to answer questions but said he "would get a lawyer" eventually).

Peter argues that he did not knowingly and voluntarily waive his Miranda rights and that, therefore, every statement he made during the hour-long interrogation is inadmissible. In the alternative he argues that, even if he did waive his Miranda rights at the outset of the interrogation, he ultimately invoked his right to counsel roughly twelve minutes later, rendering inadmissible every statement he made during the remaining 48 minutes.[4] We address these arguments in turn.

## II. DISCUSSION

### A. Waiver

Statements made by an uncounseled suspect "during a custodial interrogation [are] inadmissible at trial unless the prosecution can establish that" the suspect "waived [his Miranda] rights." Berghuis v. Thompkins, 560 U.S. 370, 382 (2010). Here, there is no question that Peter signed an express waiver of his Miranda rights and proceeded to answer questions. "Accordingly, the only remaining question is whether" Peter's decision to "sign[] the Miranda waiver w[as] knowingly and voluntarily made." Hawthorne v. Schneiderman, 695 F.3d 192, 198 (2d Cir. 2012) (internal quotation marks omitted). The decision was knowing so long as Peter understood his Miranda rights (and thus the consequences of abandoning them), and it was voluntary

---

[4] Because the facts underlying this alternative claim have almost no bearing on our analysis of it, we summarize them only as necessary in the discussion that follows.

8

so long as it was not the product of coercion. See United States v. Plugh, 648 F.3d 118, 127-28 (2d Cir. 2011).

**1. The Waiver Was Knowing**

"There is no basis in this case to conclude that [Peter] did not understand his [Miranda] rights." Berghuis, 560 U.S. at 385. As the video of the interrogation shows, Peter received an oral Miranda warning, and he read his rights himself on the warning form; he confirmed his understanding of each right, both verbally and in writing; and he has alleged no limitation--such as a language barrier, illiteracy, or incompetence--that prevented him from appreciating what he heard or saw. He thus cannot contend that he "did not understand his rights[,] and from this it follows that he knew what he gave up when he spoke." Id. at 385-86 (finding "more than enough evidence . . . to conclude that [the defendant] understood his Miranda rights" where he "received a written copy of the Miranda warnings," the interrogating detective "read the warnings aloud," and nothing suggested that the defendant "could [not] read and understand English").[5]

---

[5] Peter argues that the conclusion that he understood his rights is undermined by the fact that he affirmed his understanding in writing only after Detective Brennan *told* him to "write yes and then initial" on the Miranda waiver form. ECF No. 58 at 7. However, Brennan gave this instruction only after Peter had affirmed his understanding verbally, and "[w]ritten confirmation of a verbal [expression of understanding] is, of course, not [even] required." United States v. Medina, 19 F. Supp. 3d 518, 540 (S.D.N.Y. 2014) (citing North Carolina v. Butler, 441 U.S. 369, 373 (1979)).

9

Notwithstanding the foregoing, Peter argues that the detectives were required to inquire further into whether he understood that he was relinquishing his rights. ECF No. 58 at 3, 7. This argument fails for two reasons. First, the detectives *did* perform the inquiry that Peter claims he was denied. Detective Brennan read Peter a statement in which Peter confirmed that he understood his rights and that he was nevertheless willing to answer questions; Brennan then asked Peter if he understood that statement, and while Peter did not audibly respond, he proceeded to sign the statement and answer the detectives' questions. Second, as a matter of law, the detectives were not obligated to undertake this inquiry or even to secure Peter's express waiver. Where, as here, "a Miranda warning was given and . . . understood by the accused, [the] accused's uncoerced statement[s] establish[] an implied waiver of [his Miranda] right[s]." Berghuis, 560 U.S. at 384. Peter's waiver was therefore indisputably knowing.

**2. The Waiver Was Voluntary**

As to his contention that his waiver was coerced, Peter fares no better. Indeed, none of the traditional hallmarks of coercion are present on this record. See Moran v. Burbine, 475 U.S. 412, 421 (1986) ("The record is devoid of any suggestion that [the] police resorted to physical or psychological pressure [of any sort]."). There is no evidence that the detectives

10

"threatened or injured" Peter or that Peter "was in any way fearful"; to the contrary, the detectives sat and spoke with Peter in a relaxed and gentle manner, and Peter remained calm throughout the interrogation. Berghuis, 560 U.S. at 386. The interrogation was relatively brief and conducted "in a standard-sized room in the middle of the [day]," and there is no contention that Peter was deprived of food or rest. Id. at 386-85.

Peter's claim that he was in fact coerced is largely based on two mischaracterizations of the record. First, he argues that the detectives preyed on his physical vulnerabilities--namely, his injured arm and missing shirt--in order to elicit his waiver. Second, he argues that the detectives effectively ordered him to agree to waive his rights. Neither argument has merit.

### i. Peter's Physical Condition

As a threshold matter, we reject any suggestion that Peter's physical condition at the time of his interrogation rendered his waiver or ensuing statements inherently involuntary. Peter correctly notes that, in extreme cases, a suspect may be so physically debilitated that he cannot "exercise [] a rational intellect and a free will." Mincey v. Arizona, 437 U.S. 385, 398 (1978). However, those cases generally involve an "incapacitated and sedated suspect,"

Berghuis, 560 U.S. at 387, and they are therefore inapposite. See, e.g., Mincey 437 U.S. at 398 (finding statements involuntary where the defendant--drugged and "on the edge of consciousness"--was interrogated while "lying on his back on a hospital bed, encumbered by tubes, needles, and [a] breathing apparatus," hours after having been wounded "almost to the point of [being in a] coma," and his inability "to think clearly" was evident from his "[in]coherent" and "unresponsive . . . answers"). While Peter had recently suffered a gunshot wound, he had received the necessary treatment in a hospital and been medically cleared to leave under his own power. He had also stated that he was "all right" in response to a direct question from Detective Brennan. However uncomfortable he may have been, the video discloses that he remained coherent, responsive, alert, and lucid. Individuals who similarly retain their faculties--even in the face of more severe medical issues--retain the power to voluntarily waive their Miranda rights. See, e.g., United States v. Khalil, 214 F.3d 111, 121-22 (2d Cir. 2000) (statements were voluntary where the defendant was interrogated at the hospital while "being prepared for life-saving surgery" for a gunshot wound to his leg because "he was alert, seemed to understand the agent's questions, and gave responsive answers"); Campaneria v. Reid, 891 F.2d 1014, 1029 (2d Cir. 1989) (statements were voluntary where the defendant

12

was interrogated at the intensive care unit "with tubes running in and out of his body" after "suffering from a serious knife wound" because he was "alert and awake despite his pain" and thus not "unduly susceptible to manipulation by his interrogators").

The same result obtains with regard to Peter's missing shirt. Again, Peter is correct in noting that "physical deprivations . . . such as depriving an accused of . . . clothing" may amount to coercion. Green v. Scully, 850 F.2d 894, 902 (2d Cir. 1988) (citing Bram v. United States, 168 U.S. 532, 561 (1897)). But again, the cases so holding are decidedly inapposite. In Bram, for example, the suspect was taken to a detective's private office and forcibly stripped of all of his clothing. See 168 U.S. at 561. The confession was ultimately elicited "while the detective was in the act of so stripping him, or after he was denuded." Id. at 561-62. Similarly, in Townsend v. Henderson, the suspect's confession was elicited after he had been "stripped of his clothes" and placed in solitary confinement, without light or food beyond bread and water. 405 F.2d 324, 327 (6th Cir. 1968).

The outrageous conduct at issue in those cases bears no relation to the record before us. There is no indication that Peter's shirt was removed as punishment or in an attempt to make him uneasy. See Bruno v. Cunningham, No. 03 CIV. 937 (MBM),

2004 WL 2290503, at *3, *10 (S.D.N.Y. Oct. 8, 2004) (holding that "the removal of [the defendant's] t-shirt and pants [for blood testing] did not render his statement involuntary" because "he remained partially dressed" and there was "no evidence whatsoever" that "his clothes were taken as punishment" or as "a gambit to secure [his] confession"). Revealingly, Peter does not even suggest that the detectives played a role in removing his shirt; indeed, the record is silent as to whether Peter arrived at the hospital still wearing a shirt, let alone as to whether he was shirtless upon his discharge. And crucially, it is apparent from the video that Peter was not uncomfortable with his state of dress, even crediting his claim that when he held his arm across his chest, he did so because he was cold. See United States v. Anthony, No. 09-CR-557 (NGG), 2010 WL 2942642, at *5 (E.D.N.Y. July 21, 2010) ("[Defendant's] claim that agents stripped and searched him and withheld his winter clothing despite being cold, even if true, does not support a finding that his statements were made involuntarily in the totality of the circumstances," as "[h]e read a statement of his rights and signed a waiver before he proceeded to answer any . . . questions."). On this record, Peter's lack of a shirt did not render involuntary his decision to waive his Miranda rights.[6]

---

[6] While it is true that, under certain circumstances, "officers ha[ve] a duty to find clothing" for a suspect, United States v. Di Stefano, 555 F.2d 1094, 1101 (2d Cir. 1977), that duty attaches only when the suspect is

14

In view of the foregoing, Peter resorts to distorting the record, asserting that Detective Brennan "took advantage" of his physical condition in a manner that coerced him into waiving his rights. ECF No. 58 at 6. This argument is based on an out-of-context reading of Brennan's comment, "You've got to be cold and in some pain, so we want to try to get through this, you know, quickly." Peter casts this comment as a thinly-veiled threat that if he did not forthwith dispense with his rights and tell the detectives what they wanted to know, they planned to keep him--wounded and cold--"in custody . . . for an indeterminate period" of time, "without the ability to speak with a lawyer or appear before a judge." ECF No. 58 at 6. This characterization of Brennan's comment is belied by the video.

Considering the context of the comment--namely, that it followed Brennan's question, "You all right, bud?"--and the sympathetic tone with which it was made, it is clear that Brennan was simply attempting both to build rapport with Peter and to assure him that the detectives were sensitive to his condition and therefore *not* intending to prolong the interview in order to exploit his discomfort. Cf. Green, 850 F.2d at 902 (acknowledging the coercive pressure of "prolonged" deprivations

---

discovered in a compromising state of undress, usually during an in-home arrest. See, e.g., id. at 1097 (involving a female suspect discovered in her nightgown); United States v. Titus, 445 F.2d 577, 578 (2d Cir. 1971) (involving a male suspect discovered in the nude). For reasons self-evident (or else stated above), no such duty applied here. Moreover, Peter does not contend that he requested additional clothing.

15

of physical accommodations). Further probative is "how the accused reacted," Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973), and Peter in no way indicated--either verbally or non-verbally--that he perceived Brennan's comment to be anything more than an innocuous pleasantry. Accordingly, viewing Brennan's comment and Peter's physical condition collectively, we reject Peter's characterization of the record and the inference of coercion that he draws from it.

### ii. The Detectives' Instructions

Peter's argument that he agreed to waive his rights only because the detectives told him to do so, rather than because he wanted to, is similarly predicated on a mischaracterization of the record. Peter seizes on two comments made by the detectives concerning the Miranda waiver form: Detective Brennan's comment, "You've got to sign this," and Detective Fisco's affirmative response when Peter asked, "I have to write it?" (in reference to the date and time). Peter cites these comments as evidence that he was "ordered" to sign and date the form and to thereby waive his rights. ECF NO. 58 at 7. Once again, the context in which the comments were made refutes Peter's description.

At the time that Detective Brennan made his comment, he had just finished reading Peter a statement effectively asking if Peter was willing to answer questions even though he had the right not to do so; he had then immediately moved on to asking

Peter a question before realizing that he had forgotten to solicit Peter's consent. Thus, it is clear that by stopping mid-question and saying to Peter, "Oh, I'm sorry. You've got to sign this," Brennan was saying that he could only continue to ask Peter questions if Peter chose to sign the waiver form, not that Peter *had* to waive his rights and answer questions. This view of the exchange is further supported by the fact that Brennan followed up by confirming that Peter understood the waiver form, and only after being so cautioned did Peter sign it. Moreover, Brennan's body language and tone were decidedly unthreatening, and there is no indication that Peter felt otherwise.

Finally, the insignificance of the exchange between Peter and Detective Fisco regarding the date and time is apparent from the emphasis placed on the words spoken. As is clear from the video, the question to which Fisco responded affirmatively was "*I* have to write it?" and not "I *have to* write it?" It is therefore clear that Fisco sought to ensure only that the form was signed in Peter's own hand, not that Peter signed the form, thereby waiving his rights.

Accordingly, Peter's waiver was both knowing and voluntary.

**B. Invocation of the Right to Counsel**

Even "[a]fter a suspect has knowingly and voluntarily waived his Miranda rights," interrogating officers must

17

immediately cease all questioning if and when the suspect invokes his right to have counsel present. Berghuis, 560 U.S. at 406; see also Edwards v. Arizona, 451 U.S. 477, 484–85 (1981). Peter argues that regardless of whether he waived his Miranda rights at the outset, he unambiguously invoked his right to counsel roughly twelve minutes after the Miranda colloquy when he stated, "I guess I want to talk to my attorney," and yet his interrogation continued for an additional 48 minutes. Accordingly, Peter submits that all of the statements that he made during the final 48 minutes of the interrogation must be suppressed.

We need not address the merits of Peter's argument because the Government has stipulated that it will not seek to admit in its case-in-chief any of the statements that Peter made during the final 51 minutes of the interrogation. ECF No. 59 at 9; but see Harris v. New York, 401 U.S. 222, 225-26 (1971) (statements elicited in violation of a defendant's Miranda rights, which are thereby inadmissible as part of the Government's case-in-chief, may still be admissible for impeachment purposes). As a result, that much of Peter's motion that concerns the final 51 minutes of questioning is moot.

### III. CONCLUSION

For the foregoing reasons, Peter's motion to suppress statements made during the first twelve minutes of questioning

18

after the Miranda colloquy is denied as meritless; the remainder of Peter's suppression motion is denied as moot.

**SO ORDERED.**

Dated: New York, New York
October 24, 2018

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE