UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
UNITED STATES OF AMERICA,

      - against -

                                **MEMORANDUM AND ORDER**

SEAN PETER, a/k/a "Huggie," JASON
CAMPBELL, a/k/a "Holiday," a/k/a "Fish,"     17 CR 054 (NRB)
and STEVEN SYDER,

                Defendants.
----------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     Defendants Sean Peter, Jason Campbell, and Steven Syder were each convicted after a jury trial of all three counts included in a January 2017 indictment: (1) conspiracy to distribute and possess with intent to distribute marijuana, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(D); (2) murder through the use of a firearm during and in relation to a narcotics conspiracy, in violation of 18 U.S.C. § 924(j); and (3) possession of a firearm that was discharged during and in relation to a narcotics conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). Before the Court are the defendants' post-verdict motions, through which each defendant seeks a judgment of acquittal (based on the alleged insufficiency of the evidence), see Fed. R. Crim. P. 29, or alternatively a new trial (based on alleged trial defects), see Fed. R. Crim. P. 33. This Memorandum and Order first addresses the new trial motions and then addresses the acquittal motions. For the reasons stated herein, all of the motions are denied.

## I. Motions Under Federal Rule of Criminal Procedure 33

Rule 33 vests a court with broad discretion to "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. But motions for such relief "are granted only in extraordinary circumstances, where a court is left with a real concern that an innocent person may have been convicted." United States v. Pauling, 256 F. Supp. 3d 329, 334 (S.D.N.Y. 2017) (internal quotation marks and citations omitted), aff'd, 924 F.3d 649 (2d Cir. 2019). The defendants argue that the Court should harbor concerns as to their innocence because several occurrences conspired to deprive them of a fair trial. See United States v. Feng Ling Liu, No. 12-CR-934-01 RA, 2015 WL 4460898, at *15 (S.D.N.Y. July 20, 2015) ("[A] Rule 33 motion [requires a court to] take a holistic account of all [of the] factors that [may have] deprived a defendant of h[is] right to a fair trial."), aff'd sub nom. United States v. Bandrich, 636 F. App'x 65 (2d Cir. 2016).

The Court has no doubt that the defendants in this case received a fair trial and are therefore not entitled to the do-over that they seek. Their arguments to the contrary are addressed and rejected *seriatim*.

### A. Summation

The bulk of the defendants' briefing concerns purportedly improper statements made by the Government during its summation (and rebuttal summation). To warrant a new trial, "a prosecutor's

comments upon summation [or rebuttal] must [have] so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." Unites States v. Coriaty, 300 F.3d 244, 255 (2d Cir. 2002) (internal quotation marks omitted). It is therefore not enough for the defendants to demonstrate prejudice; they must demonstrate "substantial prejudice." Id. "Determining the existence of substantial prejudice involves three factors: the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." United States v. Feliciano, 223 F.3d 102, 123 (2d Cir. 2000) (alteration and internal quotation marks omitted).

Most of the allegations of improper statements raised by the defendants "are not worthy of lengthy discussion." United States v. Locascio, 6 F.3d 924, 946 (2d Cir. 1993). A few, however, "merit[] some consideration." Id.

### 1. Statements Inviting Certain Inferences

The defendants point to at least nine statements made by the Government and argue that they lacked an adequate basis in the record. We limit our discussion to arguably their strongest contentions and find even those lacking.

For example, Peter argues that it was improper for the Government to state as follows:

> Was it just a coincidence that Sean Peter was driving around in the middle of the night in a black Lincoln SUV, just happened to come across [the eventual victim, Brian] Gray and [his friend Julian] Martinez trying to

> rob [Peter's] brother's stash house?  Of course not.
> Why was Sean Peter there?  Because he was on protection
> detail for the stash house, which had been robbed before,
> and he wanted to make sure it didn't happen again.

Tr. 899-900.  While Peter is correct that the Government failed to present direct evidence that he knew of the prior robberies of his brother's stash house, that knowledge could have readily been inferred from the circumstantial evidence before the jury.  Indeed, the very fact that Peter responded to the sight of two individuals walking in the direction of the stash house by confronting them and shouting "Do y'all think I don't know what the fuck y'all doing?  If you think you're going to rob my brother, you got another thing coming to you," suggested his awareness of the prior robberies.  Tr. 526.  Coupled with the fact that Peter followed those individuals before he confronted them and even circled around the block after the confrontation to ensure that they had left -- resulting in yet another confrontation -- this evidence supported the further inference that Peter was patrolling the block on the night in question in order to discourage or impede robbery attempts.  While Peter was free to argue to the jury that his presence on that block was merely a product of its proximity to his home, the jury was free to see things the Government's way. See United States v. Bonventre, 646 F. App'x 73, 88 (2d Cir. 2016) ("That defendants disagree with the strength of the government's inferences does not establish prosecutorial misconduct.").

Campbell similarly argues that the Government mislead the jury by stating that Ronald Bettis "saw . . . Campbell" and his codefendants approaching the victims with guns, even though Bettis had not actually fingered the three defendants as the specific individuals he had seen. Tr. 792. But as the Government explained to the jury, Bettis had described the individuals he had seen with specificity, and his descriptions plainly aligned with the depictions of the defendants in numerous videos from the night of the shooting[1] that were played for the jury at trial. Beyond describing the individuals as "black," "tall," and "slim," Bettis had listed their precise clothing combinations: "Black shirt, white pants. Black shirt, black pants. Black hoody and blue jeans." Tr. 87. Given the video evidence that the defendants were dressed in clothing of that sort and together in the area near Bettis's home at the time in question, the inference suggested by the Government -- that the defendants were the individuals Bettis had seen from his window -- was entirely appropriate. United States v. Hawkins, 125 F. App'x 364, 366 (2d Cir. 2005) (finding no misconduct where the Government presented a fair "view of the evidence, which the jury could accept or reject based on its own judgment and knowledge of the entire record.").

---

[1] Although the shooting at issue in this case technically occurred during the early morning of October 2, 2012 -- shortly after 2:00 a.m. -- this Memorandum and Order describes it *passim*, together with the key events that immediately preceded it, as having occurred at night.

Finally, Syder claims that there was an insufficient evidentiary basis for the Government to argue that he (and presumably Campbell) bore responsibility for the black duffle bag -- containing, *inter alia*, more than a pound of marijuana, a digital scale, hundreds of Ziploc baggies, $3,674 in cash, three different kinds of ammunition (including spent shell casings) matching the types found at the scene of the fatal shooting of Brian Gray, and a cellphone belonging to one of the victims of the shooting -- that Peter carried from his home (where all three defendants had been for roughly an hour after the shooting) into the van that drove all three defendants to the hospital in Teaneck, New Jersey, where Peter sought treatment for a gunshot wound. Because the defendants did not object to the statements in question at trial, they must establish that those statements "amounted to a flagrant abuse."[2] <u>Coriaty</u>, 300 F.3d at 255 (internal quotation marks omitted). In view of the "broad latitude [accorded to the Government with regard to] the inferences it may reasonably suggest to the jury during summation," the defendants fall well short of meeting this standard. <u>United States v. Edwards</u>, 342 F.3d 168, 181 (2d Cir. 2003).

---

[2] Syder identifies three statements through which the Government suggested that the defendants were jointly responsible for the bag. By way of illustration, the most directly suggestive of these statements was: "You know that the . . . bag belonged to all three of the defendants. . . . It's completely absurd to think that any of these defendants didn't know about the contents of that bag, or that the contents of the bag belonged to only one of them." Tr. 757-58.

The Government was clinical in its recitation of the evidence that it suggested supported the inference that the defendants were jointly responsible for the bag described above. That evidence sufficiently established, *inter alia*, that the defendants, who earlier that night had together retrieved firearms that had been stashed outside of Peter's home and thereafter returned them to that single location, emerged from Peter's home in succession, with Peter carrying the bag; that the bag, which was left open such that the marijuana was visible and emitting a detectable odor, was placed in the middle of the van in which all three defendants rode, between the rear seats occupied by Peter and Syder; that the bag contained a distribution (rather than personal-use) quantity of marijuana, as well as three different kinds of ammunition -- consistent with the defendants' earlier possession of three different firearms -- matching the types found at the scene of an earlier shooting to which overwhelming evidence tied all three defendants; that when Peter left the van to enter the hospital, Syder joined him, leaving Campbell in the van with the bag; and that the defendants acted in lockstep throughout the entire night in question -- from the highly organized moments preceding the shooting, through its commission, up to the coordinated lies that the defendants each told interrogating officers after they were detained in Teaneck, New Jersey. Coupled with the other evidence cited by the Government -- discussed at greater length elsewhere

in this Memorandum and Order -- tending to show (albeit to varying degrees) the defendants' individual and collective connection to marijuana distribution and the drug-related origins of the dispute that allegedly gave rise to the shooting, this evidence provided the Government with a sufficient basis to ask the jury to deem all three defendants responsible for the bag.

In sum, none of the defendants' challenges to the Government's statements on summation or rebuttal on the ground that they exceeded the scope of the record evidence advance the defendants' new trial motions.

### 2.   Statements Concerning the Timeline of Events

The defendants challenge in several respects the Government's presentation -- both as spoken and as written on the PowerPoint slides that the Government used during its summation -- of the approximate times at which certain events depicted in surveillance footage admitted into evidence actually occurred.[3]  All of the challenges fail.

---

[3] The defendants necessarily devote a substantial portion of their briefing to attacking the Government's proffered timeline of the events depicted in these videos.  That is because, viewing the evidence in the light most favorable to the Government, the timeline (as reconstructed by the Government) revealed the following damning sequence: Syder and Campbell watch the victims leave a deli 30 minutes before the shooting, as Syder speaks with someone on the phone; Syder and Campbell leave in the direction of Peter's home; all three defendants walk toward where the victims had been congregating prior to their trip to the deli and where they in fact recongregated following that trip; the defendants then approach Peter's home minutes before the shooting and retrieve from trash cans located there one firearm each; the defendants head off in a direction that could have taken them to where the victims were congregating -- the eventual scene of the shooting -- wearing clothing consistent with the description provided by a witness who saw three men approach the victims with

8

As a threshold matter, the Court summarily rejects the defendants' assertion that the Government "fabricated," "altered," or "manipulated" trial exhibits by presenting the videos on PowerPoint slides that also featured text stating the approximate "real times" that the Government was proffering to the jury. As the Government correctly notes, the "slides that played the video exhibits admitted into evidence . . . clearly showed the original timestamps from those exhibits." ECF No. 124 at 60. The Government's proposed "real times" were depicted below the videos on the slides. It is commonplace for prosecutors to use in summation slide decks that feature -- alongside reproductions of trial exhibits -- text that similarly amounts to argument. See, e.g., United States v. Nolan, No. 14 CR. 555 (GBD), 2015 WL 10792043, at *3 n.13 (S.D.N.Y. Aug. 11, 2015). For the avoidance of doubt, the Court specifically asked the Government in open court to "clarify [for the jury] that the time stamp[s] at the bottom [of the slides were] not on the original exhibit[s]," and the Government so clarified. Tr. 772.

Turning to the defendants' primary argument, the Government neither obscured the fact that it had calculated the purported

_____

guns drawn before opening fire; the defendants run from the scene of the shooting in its immediate aftermath; the defendants return to Peter's home moments later and stash their three firearms back into the trash cans, before entering Peter's home; and finally, the defendants leave Peter's home -- with a bag containing the same three types of ammunition later found at the scene of the shooting -- and enter a van that thereafter takes them to a hospital where Peter seeks treatment for a gunshot wound.

real times itself based on inferences drawn from the record nor exceeded the scope of the record in arriving at those inferences. The Government clearly stated early in its presentation that it would "go through exactly how the approximate time is calculated and how you can calculate the approximate time yourself." Tr. At 772. The Government thereafter followed through.

As the Government explained, the real times were rooted in the unrebutted testimony of Detective Thomas Green, who had participated in the collection of the surveillance footage. The Government began by directing the jury's attention to the fact that a police car racing to the murder scene appeared on two of the videos in evidence, which Detective Green testified had been shot from cameras located roughly one block away from one another. Recalling Detective Green's testimony that the time reflected in one of those videos (approximately 2:11:10 a.m. on October 2, 2012) was correct, while the time reflected in the other video (approximately 2:13:30 p.m. on October 1, 2012) was incorrect, the Government invited the jury to infer that the two videos were actually only a few seconds apart. This in turn permitted the inference that the latter camera was off by approximately 11 hours and 57 minutes -- consistent with Detective Green's testimony that the latter camera was "approximately 12 hours slow." Tr. 289. A similar analysis permitted the inference that a third video, which also depicted the police car at an incorrect time (approximately

10

3:14:09 p.m. on October 1, 2012), was off by approximately 10 hours and 57 minutes -- consistent with Detective Green's testimony that the latter camera was "approximately 11 hours slow." Tr. 289. Based on the foregoing, the Government submitted that the jury could determine the approximate actual time at which other events depicted in the incorrectly-timestamped videos occurred by adding either 11 hours and 57 minutes or 10 hours and 57 minutes as appropriate. Thus, the Government's calculations were both methodically explained to the jury and plainly grounded in the record evidence.[4]

This very foundation in the evidence presented at trial renders meritless the defendants' additional contention that they were somehow deprived of notice that the Government would be arguing in summation that the events depicted in the videos occurred at times that accorded with the Government's theory of the case. Indeed, the timeline that the Government ultimately advanced was consistent with the its pretrial disclosures, its opening statement, its examination of witnesses -- including its systematic questioning of Detective Green, which laid the groundwork for its calculations[5] -- and its statements at the Rule

---

[4] What's more, the sequence of events revealed by using the real times calculated by the Government is consistent with all of the evidence in the record. See e.g., ECF No. 124 at 63-64.

[5] The Government's questioning of Detective Green deliberately homed in on which timestamps were correct, which timestamps were incorrect (and approximately how incorrect they were), the relative positioning of the cameras

29 argument that preceded the jury charge. Having so telegraphed its overall theory of the case, the Government was certainly not required to take the additional step of providing the defendants with notice of the specific inferences -- including the approximate real times -- that it planned to suggest to the jury in summation.

Nor does the record disclose that the defendants were prejudiced in any event. The defendants had every opportunity to cross-examine Detective Green as to the location of the relevant cameras, the accuracy *vel non* of certain timestamps, and how he determined with such specificity that particular videos were approximately 11 or 12 hours slow. In fact, despite their supposed surprise, the defendants did argue extensively in closing for an alternative timeline to that offered by the Government, devoting significant attention to highlighting purported flaws in the Government's inferences and calculations. See, e.g., Tr. at 875-80. The defendants cannot establish their entitlement to a new trial by merely rehashing arguments reasonably rejected by the jury.[6]

---

that recorded the videos, and the location and timestamps of the videos that captured the otherwise irrelevant police car.

[6] The jury reasonably rejected the defendants' argument that the three-minute window that separated the moments the Government claimed surveillance footage showed the defendants retrieving firearms from outside Peter's home and then returning to Peter's home to stash those firearms was too brief for the defendants to have participated in the shooting. See Tr. at 879. The shooting occurred only two blocks away from Peter's home, and the jury was shown video of the defendants *sprinting* away from the location of the shooting in the direction of Peter's home.

### 3. Statement About the Law

Campbell argues that the Government exceeded the bounds of permissible argument by claiming with respect to the defendants' possible motive for Brian Gray's murder -- effectively an element of the murder and firearm charges respectively contained in Counts Two and Three of the indictment -- that "Defense counsel may want you to think that it has to be one or the other. Personal or drugs. But that's just wrong. That's not the facts, and that's not the law." Tr. 803. In sustaining a defense objection to this comment, the Court forcefully admonished the Government, "Please, why don't you leave the law to me." Tr. 803.

The Court was (and remains) sensitive to this particular issue because -- to a significant degree -- the defendants based their

---

The jury also reasonably rejected the defendants' argument that the relevant videos actually showed the defendants *stashing* items during their *first* trip to Peter's home and *retrieving* items during their *second* trip. See, e.g., Tr. 877-78. The videos themselves were before the jury, which heard the two sides' conflicting interpretations -- as well as a host of circumstantial evidence bearing on the plausibility of each -- and was free to arrive at the conclusion that it did. That a police report characterized the videos in the manner favored by the defendants is of no moment here: the report was included in the § 3500 material for Detective Green, which means that the defendants had the opportunity to make use of it and evidently declined to do so.

Finally, the jury reasonably rejected the defendants' argument that, because multiple police cars responded to the murder scene on the night of the shooting, the Government's calculated real times -- based as they were on multiple videos of what the Government *asserted* was the same police car -- were unreliable. See Tr. at 876. Again, the jury viewed the videos and was free to conclude that the same car was depicted in each -- a conclusion that cohered with Detective Green's testimony. The defendants could have played for the jury video that the Government had entered into evidence (and disclosed to the defendants well in advance of trial) showing a police car and a police van passing the relevant cameras approximately six seconds apart from one another at timestamps different from those reflected in the videos relied on by the Government. But there were sound strategic reasons for them to have instead advanced their argument in the way that they did, and the fact that that argument failed to persuade the jury is not a basis for granting the defendants a new trial so that they might pursue a different approach.

defense at trial (as they now base their post-trial motions) on the theory that, even if they in fact murdered Brian Gray through the use of a firearm, the evidence showed that they did so for "personal" reasons unrelated to any narcotics conspiracy. But the Court is satisfied that its admonition, colored by the tone with which it was delivered, was sufficiently curative of any prejudice in view of the Government's concession to the jury at numerous points in its summation -- reiterated in clear instructions from the Court throughout trial -- that the *Court* would be the final arbiter of the law.

Fortunately, the call need not be a close one: even ignoring these curative (and prophylactic) measures, the defendants cannot establish that the Government's comment regarding the applicable law -- although not directly accompanied by any disclaimer as to the Government's lack of authority on the matter -- resulted in prejudice. That is because the Government's characterization of the law was correct, see Thomas v. United States, No. 04-CR-801 (PKC), 2018 WL 4006785, at *2 (S.D.N.Y. Mar. 9, 2018) ("Even if there was an additional personal motivation for the murders, 'the government need only prove beyond a reasonable doubt that *one* motive for the killing . . . was related to the drug conspiracy.'" (alteration and emphasis in original) (quoting United States v. Desinor, 525 F.3d 193, 202 (2d Cir. 2008))); accord United States v. Nina, 734 F. App'x 27, 32 (2d Cir. 2018), and not inconsistent

with the Court's own jury instructions, which the defendants did not and do not challenge.

### 4.  Statement About What Was Not Disputed

The defendants take issue with the Government's representation to the jury that there was "no dispute that Sean Peter and two other men murdered Brian Gray."  Tr. 746.  In its briefing papers, the Government adheres to its position, first expressed at sidebar following a defense objection, that this statement was adequately grounded in the following admission made by Peter during his opening statement, see United States v. McKeon, 738 F.2d 26, 30 (2d Cir. 1984) ("[T]he binding effect of an opening statement within the four corners of a single trial [is] well established."):

> Sean's friend[s] saw several members of [Brian Gray's] gang just a few blocks from Sean's home.  They alerted him, and he and two friends confronted the gang on Barker Avenue[;] a shootout ensued. . . . Sean Peter was shot in his right forearm with the bullet going in one side and coming out the other.  Brian Gray was also shot in the arm with a bullet going in one side and out the other but it then went in his chest, where it caused his death. . . . Sean and his friends then hurried back to Sean's house.  They got rid of the guns.

Tr. 51-52.

While Peter's opening statement certainly adopted several aspects of the Government's theory of the case, the Court agrees with the defendants that the Government's characterization of that statement risked leaving the jury with the mistaken impression that the defendants had pleaded guilty to the crime charged in

15

Count Two, when they had in fact pleaded not guilty to the entire indictment. That risk of prejudice, however, was adequately mitigated by the curative measures both taken and ordered by the Court, which were directly addressed to the concerns raised in the instant motions.

In sustaining the defendants' objection at trial, the Court stated the following in the presence of the jury (with some vigor not fully reflected in the transcript): "Excuse Me. Hold on. . . . I don't think that they've pled guilty to that. I think they pled not guilty to the entire indictment." Tr. 746. After the Court then admonished the Government at sidebar to "clean it up," the Government resumed its summation by stating "I want to make one thing clear before we go forward. The defendants here have pled not guilty. The burden of proving their guilt is on the government. We welcome that burden. And it's our duty to prove to you that each of the defendants is guilty of the crimes charged beyond a reasonable doubt." Tr. 750-51. Thus, "despite the Government's somewhat infelicitous phrasing, the Government and the Court made clear to the jury . . . that the Government had the burden of proof, including on the specific facts the Government suggested were not in dispute." United States v. Rosario, No. 09-CR-415-2 VEC, 2015 WL 518217, at *8 (S.D.N.Y. Feb. 9, 2015).

Nor did the Government's statement create (or enhance an existing) Bruton problem as to Campbell and Syder. As the

defendants correctly note, <u>Bruton v. United States</u> stands for the proposition that the prejudice occasioned by the admission of a codefendant's unconfronted confession cannot be cured by instructing the jury to consider the confession as to only the confessing defendant.  <u>See</u> 391 U.S. 123 (1968).  But here, the curative measures *were* effective because they did not seek to unring the bell of an actual confession; rather, they clearly noted for the jury that no such confession had been made, while reiterating the placement (on the Government) and weight (beyond a reasonable doubt) of the applicable burden of proof as to all three defendants for all charges.

Finally, it bears noting that, while closer calls existed as to other dispositive elements of the murder charge in Count Two (such as the defendants' membership *vel non* in a marijuana conspiracy and motive, if any, for the murder), for reasons thoroughly explained elsewhere in this Memorandum and Order, the evidence that all three defendants in fact participated in the murder of Brian Gray was unusually overwhelming.  Therefore, the excerpted portion of Peter's opening statement and the Government's characterization thereof (as cured) can hardly be said to have substantially prejudiced any of the defendants.

### B.  Brady Violations

Peter argues that on two occasions the Government improperly withheld Brady material related to Government witness Julian

Martinez.  To establish a Brady violation and therefore entitlement to a new trial, "a defendant must show that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice."  United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001).  Peter cannot make this showing.

First, Peter asserts that the Government's disclosure of Martinez's grand jury testimony -- which he claims contained exculpatory evidence -- was so belated as to give rise to a Brady violation.  Peter focuses in particular on Martinez's testimony regarding his attempt to shoot Peter after Peter confronted him during his attempt to rob Peter's brother's stash house; Peter characterizes this testimony as "direct evidence" in support of his defense theory that his motive for shooting Brian Gray -- who had attempted to rob the stash house along with Martinez -- was personal in nature rather than related to any drug crime, as required by the relevant statutory provisions.  ECF No. 112 at 22.  This argument fails easily.

"[A]s long as a defendant possesses Brady evidence in time for its effective use, the government has not [committed a Brady violation] simply because it did not produce the evidence sooner."  Coppa, 267 F.3d at 144.  There is no question that the Government's disclosure of Martinez's grand jury testimony, which the

18

Government represents (without dispute) occurred five days prior to trial,[7] permitted its effective use; nor is there any reason to believe that an earlier disclosure would have made its use more effective. Peter introduced his purported personal motivation for the shooting during his opening statement and made it the centerpiece of his closing argument. Crucially, Peter also made effective use of the grand jury testimony at issue during his cross-examination of Martinez. Through this cross-examination, the jury was made well aware of the events that transpired after Peter confronted Martinez in the vicinity of his brother's stash house; Martinez freely admitted to having attempted to kill Peter by shooting him at close range. And what's more, Peter can hardly argue that his own motivation for the shooting (and the facts giving rise to that motivation) were unknown to him such that he could not have introduced them through cross-examination even without Martinez's grand jury testimony. See United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) ("[E]vidence is not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage

---

[7] The Government also disclosed in its motions in limine filed more than a month before trial that an individual -- albeit an unnamed individual -- who had attempted to rob Peter's brother's stash house along with Brian Gray had attempted to shoot Peter during the confrontation that ensued.

of that evidence." (alteration and internal quotation marks omitted)). Accordingly, there is no Brady violation to speak of.

The same result obtains with regard to Peter's claim that the Government intentionally concealed Martinez's criminal history, thereby depriving Peter of the ability to adequately impeach Martinez. This argument stems from the fact that, in its motions in limine, the Government erroneously referred to Martinez as "Victim-3" (even though Martinez was not one of the victims of the shooting) and mentioned only the prior bad acts of Victim-3 that the Government sought to preclude, resulting in the omission of his conviction for armed robbery. Peter is correct that in referring to Martinez as a victim, the Government was, at best, negligent -- a fact that the Government has since acknowledged, both at sidebar and again in its briefing papers -- and that the mislabeling could have inhibited Peter's ability to "timely investigate the background of Martinez." ECF No. 112 at 24. However, Peter cannot establish that he was actually prejudiced by either the mislabeling or the omission of the armed robbery conviction.

As the Government points out, the Government's motions in limine made clear that "[t]he Government expect[ed] Victim-3 to testify regarding . . . his participation in or about September 2012 with [Brian] Gray in an attempted robbery of a marijuana stash house used by . . . defendant Sean Peter's brother, during which

the defendant thwarted the attempted robbery and confronted Victim-3 and Gray. Victim-3 responded by trying to shoot Peter . . . ." ECF No. 66 at 26. Peter thus had the same notice of Martinez's identity that he would have had if Martinez had been more appropriately referred to as merely a "Confidential Witness," rather than a victim. And as to Martinez's armed robbery conviction, the Government represents (again without dispute) that it "produced an unredacted copy of Martinez's rap sheet to defense counsel on November 19, 2018, two weeks prior to trial, which disclosed all of his criminal history." ECF No. 124 at 73 n.11. Indeed, Peter was permitted to (and did) impeach Martinez on the basis of the armed robbery conviction, and he fails to articulate how any further impeachment of Martinez could have altered the "outcome of the trial." See Coppa, 267 F.3d at 144. In full view of the jury, Martinez: (1) acknowledged his attempts to rob Peter's brother and to shoot Peter for stopping him; (2) was rude and dismissive when spoken to by both counsel and the Court; (3) taunted and insulted Peter directly through the use of an expletive; and (4) had several of his prior bad acts laid bare. What more Peter could have asked for is unclear. A showing of prejudice is therefore entirely lacking.

## C. Erroneous Admission of Evidence

Campbell argues that his 2012 conviction for selling marijuana should not have been admitted into evidence. The

conviction was admitted as direct evidence of the charged marijuana conspiracy.  See United States v. Lyle, 919 F.3d 716, 736 (2d Cir. 2019) ("Evidence of [prior] criminal activity is [admissible as direct evidence of the charged offense] if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." (alteration and internal quotation marks omitted)).  Campbell bases his challenge on yet another regrettable misstatement by the Government.

By way of background, in multiple filings related to its motions in limine, the Government sought the admission of Campbell's conviction as a prior bad act reflecting knowledge, intent, plan, opportunity, or absence of mistake under Federal Rule of Evidence 404(b).  That argument was -- candidly speaking -- unpersuasive.  But in a letter filed a week prior to trial, the Government stated that "new information developed since the Government's [previous filing]" supported the admission of Campbell's conviction as direct evidence.  ECF No. 80 at 1.  In particular, the Government represented as to the events underlying that conviction, which occurred during the time period of the charged conspiracy, that Campbell had been arrested because he had "sold marijuana to an undercover law enforcement officer in front of 3233 Olinville Avenue" -- the location of the stash house

maintained by Peter's brother, an alleged unindicted coconspirator who was himself arrested contemporaneously for possessing marijuana in front of the stash house.  Id. at 2.  In light of these representations, which Campbell did not contest, the evidence was admitted without objection.

Campbell now argues that the evidence was erroneously admitted because, while he was in fact *arrested* in front of the stash house (along with Peter's brother), the marijuana *sale* for which he was arrested actually occurred approximately 300 feet down the block from the stash house.  The Government has acknowledged that its letter misstated these facts but submits that the misstatement was immaterial.  The Court agrees.

Putting aside the possibility that Campbell's challenge has been waived because the evidence of his conviction was read into the record pursuant to a joint stipulation that stated the facts correctly, see Tr. at 631 ("Jason Campbell, the defendant, was arrested on February 3, 2012, outside 3233 Olinville Avenue in the Bronx, New York, after selling marijuana to an undercover officer at the northeast corner of Burke Avenue and Olinville Avenue . . . ."), the fact that the sale did not occur directly in front of the stash house does not undermine the admission of the conviction as direct evidence of the charged marijuana conspiracy. It is undisputed that, during the time period of the charged conspiracy, Campbell sold marijuana roughly 300 feet from Peter's

brother's stash house before walking to the stash house and standing there with Peter's brother until they were arrested together for selling marijuana and possessing marijuana, respectively. No more of a predicate was needed. The Government's misstatement thus had no bearing on the admissibility of the evidence, and Campbell's challenge is consequently unavailing.

### D.    Remaining Challenges and Cumulative Effect

The Court has considered the defendants' remaining challenges -- including Campbell's claim that he was improperly denied a severance in view of "the quantum and character of [the] evidence against his co-defendants . . . [and] the paucity of [the] evidence against him," ECF No. 119 at 31, which founders on grounds typical for such a claim, see, e.g., United States v. Lopez, No. 16 CR. 643(NRB), 2017 WL 4082474, at *1 (S.D.N.Y. Aug. 29, 2017) -- and determined that each lacks merit. The Court has likewise assessed the cumulative effect of all of the occurrences challenged in the defendants' papers and determined that they did not combine to deprive the defendants of a fair trial.

*              *              *

Accordingly, and in view of the "competent, satisfactory and sufficient evidence" presented in support of the defendants' guilt (discussed further *infra*), the Court is satisfied that no "manifest injustice" would result from letting the jury's verdict stand. United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)

(internal quotation marks omitted).  A new trial is therefore not warranted on this record.

## II.  Motions Under Federal Rule of Criminal Procedure 29

A defendant seeking a judgment of acquittal under Rule 29 based upon the sufficiency of the evidence underlying his conviction bears a "heavy burden."  United States v. Autori, 212 F.3d 105, 114 (2d Cir. 2000).  "A successful Rule 29 motion requires a showing by the defendant, considering all of the evidence, direct and circumstantial, . . . [viewed] in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," that "no rational trier of fact could have found the defendant guilty."  Pauling, 256 F. Supp. 3d at 334 (internal quotation marks and citations omitted).  "[D]eference to the jury's findings is especially important" in conspiracy cases such as this, "because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court."  United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012) (quoting United States v. Rojas, 617 F.3d 669, 674 (2d Cir. 2010)).

As the preceding section of this Memorandum and Order previewed, the issues fairly disputed in this case are --

considering the severity of the charged offenses -- relatively narrow.

In short, overwhelming evidence supported the jury's conclusion that all three defendants murdered or aided and abetted the murder of Brian Gray through the use of a firearm. While defense counsel dutifully quarrel with that conclusion in their post-trial briefing, they appropriately focus their sufficiency challenges on the closer questions of (1) whether the defendants were guilty of participating in the marijuana conspiracy charged in Count One -- a necessary predicate to the murder and firearms crimes charged in Counts Two and Three, respectively; and (2) whether, even if so, the murder and concomitant firearm discharge were sufficiently connected to the predicate conspiracy for the defendants to actually be guilty of the crimes charged in Counts Two and Three, which together criminalize murder by means of a firearm so long as it was committed during and in relation to a drug crime.

This Memorandum and Order proceeds by first surveying the evidence that plainly permitted the jury to find beyond a reasonable doubt that the defendants committed the firearm murder. It then explains that the evidence was likewise sufficient to support the jury's findings as to the twin -- and at times overlapping -- issues of the defendants' participation in a marijuana conspiracy and the connection between that conspiracy

and the fatal shooting.  The evidence is recounted in accordance with the governing legal standards outlined above.

### A.    The Firearm Murder of Brian Gray

It was well known in the Bronx neighborhood in which the events underlying this case took place that Sean Peter's brother Shane (hereinafter "Streets") was a marijuana dealer.  See, e.g., Tr. at 511 (testimony from an individual -- who said he purchased marijuana from Streets three or four times a week -- that "[m]ost of the people in [the] neighborhood" bought marijuana from Streets).  Streets sold various quantities of marijuana, ranging from personal-use quantities (such as grams) to distribution quantities (such as pounds), out of a ground-floor apartment at 3233 Olinville Avenue (hereinafter "the stash house"); customers would knock on the door of the stash house or else show up at the gate out front and proceed to purchase their marijuana.  The stash house thus functioned as the home base of a marijuana-distribution operation rather than as a location at which anyone actually resided.  See Tr. at 447 (testimony from an individual who lived in the apartment directly above the stash house, who knew Streets for "about two years," and who purchased marijuana from Streets out of the stash house for about one year, that he did not "know where Streets lived" and that the stash house was "an empty apartment" where "a lot of people [would] loiter").  Streets would also sell marijuana at other locations, including inside a local

corner store that people in the neighborhood knew to be a "weed spot" -- that is, a place where they could go to purchase marijuana -- and other places in the neighborhood where customers would ask to meet him, sometimes arranging those meetings over the phone. Tr. at 461.

In or around the middle of September 2012, Brian Gray and Julian Martinez, two of Streets's customers, attempted to rob the stash house of marijuana and marijuana proceeds. Their plan was to enter the stash house and have one of them "watch [Streets] while the other one went through and got whatever it was [they could] get." Tr. at 516. The plan was developed after Gray received a tip that others had "done it before" and that "it would be easy." Tr. at 515. Armed with guns, Gray and Martinez approached the stash house shortly after 2:00 a.m., but soon realized that a vehicle -- which they believed to be law enforcement -- was following them. In response, they walked past the stash house and circled around the block. As they walked, Gray discarded his gun.

When Gray and Martinez approached Olinville Avenue once again, the vehicle -- which had been following them all along and was in fact being driven by Peter -- pulled up alongside Gray. At that point, Peter lowered his window and screamed at Gray: "Do y'all think I don't know what the fuck y'all doing? If you think you're going to rob my brother, you got another thing coming to

you." Tr. at 526. Thereafter, Peter sped off, and Gray and Martinez backtracked so that Gray could retrieve his discarded gun. But Peter soon returned, this time pulling up alongside Martinez, lowering his window and saying: "Did you just hear what I said to your man? If you think you're going to rob my brother, you got another thing coming." Tr. 530. Martinez responded by pulling out his gun and attempting to shoot Peter at close range; Martinez pointed the gun directly at Peter and pulled the trigger two or three times, but the gun malfunctioned and failed to go off. Peter sped off once more and Gray and Martinez left on foot.

Roughly two weeks later, on October 2, 2012, Brian Gray was shot to death outside of 3309 Barker Avenue -- one avenue west and roughly half a block north of the stash house -- where he and three friends had been hanging out on and around a stoop. Two of those friends sustained non-fatal bullet wounds in the shooting; Martinez was not among the friends with Gray that night. Surveillance footage taken from commercial establishments and residences in the area, along with the testimony of an eye witness named Ronald Bettis, paint a fairly clear picture of the events that surrounded the shooting.[8] That picture is damning to the defendants, and it is best understood with reference to the map

---

[8] For reasons explained *supra*, the inferences requested by the Government concerning the timing of the events depicted in the surveillance videos were reasonably accepted by the jury, and they are thus incorporated into this recounting of the evidence.

admitted into evidence as Government Exhibit 576, which is reproduced in black and white below.



The narrative begins in a deli on the west side of White Plains Road, just north of Burke Avenue. Gray and his friends (collectively, "the victims") are seen on surveillance footage arriving roughly 30 minutes prior to the shooting; they had been drinking and smoking on and around the Barker Avenue stoop (located just a few feet north of Rosewood Street) that would later become the murder scene, and they had come to the deli to purchase additional supplies before returning to the stoop. As the victims exit the deli and head north toward Rosewood Street en route to Barker Avenue, surveillance footage shows Syder waiting outside without alerting the victims to his presence; Syder continues to speak to someone on his cellphone as Campbell arrives on the scene and briefly speaks to one of the victims before leaving with Syder in the direction of Burke Avenue, toward Peter's Lester Street home. The Government's theory that Syder and Campbell stalked the victims to learn (perhaps) where they had been and (at least) where they would be headed -- and informed Peter of the same via phone call before leaving to meet up with him -- finds ample support in that vignette when it is viewed together with the events that ensued.

Surveillance footage next picks up on Rosewood Street. Syder and Campbell, joined now by Peter, are seen walking west towards Barker Avenue roughly 15 minutes behind the victims in what -- viewed in context -- has the trappings of a reconnoitering

expedition designed to ferret out the victims' precise location near the intersection of Rosewood Street and Barker Avenue. Minutes later, the defendants are seen on video approaching Peter's Lester Street home, located two blocks south of Rosewood Street between Barker Avenue and Olinville Avenue; but rather than enter the home, the defendants take turns reaching into the two trash cans located on the sidewalk and retrieve from them one firearm each. Armed with those firearms, the defendants depart Peter's home and head back toward Barker Avenue -- roughly three minutes before the shooting.

The defendants' travels are thereafter recorded in the memory of Ronald Bettis, who watched events unfold from the bay window of his home at 3301 Barker Avenue, situated exactly on the northwest corner of Barker Avenue and Rosewood Street -- mere feet south of where the shooting occurred outside of 3309 Barker Avenue. At trial, Bettis described witnessing (1) the three defendants -- at least two of whom were holding guns -- approach the northeast corner of Barker Avenue and Rosewood Street; (2) one of them report to the other two "that's him, that's him," Tr. at 92; (3) Syder run north up Barker Avenue past Bettis's home and open fire in the direction of the victims; (4) the other two defendants follow behind him, with at least one of them opening fire; and (5) all three defendants thereafter flee south down Barker Avenue. Bettis is one of several individuals to have responded to the sound of

gunshots by calling the police, who arrived on the scene minutes later to find the victims -- including the fatally-wounded Gray -- just up the block from Bettis's home.

Additional surveillance footage helps to complete the story. Video recorded on Barker Avenue shows the defendants sprint south toward Lester Street, away from the scene of the shooting in its immediate aftermath. And video recorded on Lester Street shows them return to Peter's home moments later -- just over three minutes after they departed -- where Campbell proceeds to stash the firearms back into the trash cans from which they had earlier been retrieved. All three defendants then enter Peter's home, where they remain for more than an hour, at which time they walk from Peter's home into a van being driven by a fourth individual, Larice Robinson, who the defendants had asked to drive them to a hospital in New Jersey so that Peter could seek treatment for a gunshot wound he had sustained to his arm; Peter carries a black canvas duffle bag from his home into the van, and the van leaves Lester Street carrying all three defendants.

While surveillance footage later shows the van arrive at the Holy Name Hospital in Teaneck, New Jersey, which Peter and Syder enter, the remainder of the story can be summarized based on evidence obtained by the police officers who responded to the hospital's report of a gunshot victim. All three defendants, whose ensuing video-recorded interrogations were played at trial,

provided coordinated false exculpatory statements to law enforcement, claiming, *inter alia*, that Peter had been shot at a party in Paterson, New Jersey. Additionally, law enforcement seized the black duffle bag from the van and found it to contain -- along with other contraband described earlier in this Memorandum and Order -- three different kinds of ammunition (including spent shell casings) matching the types found at the scene of the fatal shooting of Brian Gray as well as a cellphone belonging to one of the other shooting victims.

Given this demonstrated sequence of events, it cannot be seriously disputed that sufficient evidence supported the jury's conclusion -- beyond a reasonable doubt -- that each defendant either murdered or aided and abetted the murder of Brian Gray through the use of a firearm.

**B.    The Marijuana Conspiracy and its Connection to the Murder**

Notwithstanding the foregoing, the defendants argue that there was insufficient evidence to actually convict them under the provisions charged in Counts Two and Three -- 18 U.S.C. § 924(j) and 18 U.S.C. § 924(c)(1)(A)(iii), respectively -- which (as relevant here) collectively impose federal criminal liability on individuals who commit or aid and abet a murder by means of a discharged firearm *during and in relation to a drug trafficking crime*. The defendants maintain that there was insufficient evidence to support a finding that they committed a predicate drug

trafficking crime (namely, the marijuana conspiracy charged in Count One) -- requiring the vacatur of their convictions under Counts Two and Three *in addition to* Count One -- and that, even if their convictions for the marijuana conspiracy charged in Count One were to stand, their convictions under Counts Two and Three would nonetheless fall for the independent reason that there was insufficient evidence to support a finding that the murder was committed *during and in relation to* that conspiracy. Both of these arguments fail as to all three defendants.

That said, while a reasonable jury could have found all three defendants guilty as charged beyond a reasonable doubt, the evidence against each defendant was not equal. In particular, the strength of the evidence against each defendant varied based primarily on the extent to which it concerned events that predated October 2, 2012 -- the date of the murder.

Considerable pre-murder evidence supported the jury's finding that Sean Peter conspired with at least one other individual -- namely, his brother Streets -- to distribute or possess with intent to distribute marijuana, making him guilty of Count One. That evidence unquestionably established the existence of Streets's marijuana-distribution operation, and it sufficiently demonstrated Peter's knowing involvement therein. See United States v. Hunte, 196 F.3d 687, 691 (7th Cir. 1999) ("[A] jury may consider [a defendant's] overt acts in furtherance of [a] conspiracy as

circumstantial evidence establishing [his] knowing participation in [that] conspiracy." (internal quotation marks omitted)).

Notably, Peter participated in the conspiracy by, *inter alia*, effectuating marijuana sales. Robinson testified that if he needed to find Streets to arrange a marijuana sale, he would call Peter; Peter would then either connect Robinson with Streets or personally sell marijuana to Robinson. While "merely help[ing] a willing buyer find a willing seller . . . is, without more, insufficient to establish a conspiratorial agreement, . . . criminal liability may attach" solely on that basis "when a defendant steers buyers to [a] seller[] as part of a continuing business arrangement, or is otherwise the conduit for the transaction." United States v. Ulbricht, 31 F. Supp. 3d 540, 560 n.11 (S.D.N.Y. 2014) (internal quotation marks and citations omitted). Here, because Peter personally made sales of marijuana and took other measures to further the conspiracy (discussed in depth *infra*), his conviction need not rest solely on his facilitation of transactions for Streets; nonetheless, his actions in that regard are, at a minimum, highly probative of his membership in the conspiracy. Indeed, Peter's very willingness to direct customers to Streets, notwithstanding that he was himself a marijuana dealer -- as evidenced by his own sales to Robinson as well as by the contents of the bag that he carried on the night of the murder, also discussed in depth *infra* -- indicates the brothers' conspiratorial

affiliation.  Put simply, a reasonable jury could have certainly inferred from those facts that Peter and his brother were coconspirators, rather than independent competitors in the marijuana trade.  Further supporting that inference was Robinson's testimony that he purchased marijuana from Streets and Peter for "[m]aybe a year," and that he made purchases from both individuals inside the same corner store.  Tr. at 460.

Peter also took other measures to further the conspiracy.  See United States v. Burgos, 94 F.3d 849, 859 (4th Cir. 1996) ("[A] variety of conduct, apart from selling narcotics, can constitute participation in a conspiracy sufficient to sustain a conviction.").  Specifically, for reasons explained *supra*, Peter's actions on the night that he confronted Gray and Martinez as they were preparing to rob the stash house could have readily been construed by a reasonable jury as evidence of his work as security detail or "protective muscle" for the conspiracy.  Ulbricht, 31 F. Supp. 3d at 561.  On that night, Peter demonstrated his knowledge of the marijuana-distribution operation and prior robberies of its home base; drove a vehicle -- late at night -- on the block of that home base; followed individuals walking in the vicinity of that home base as they continued past it for several blocks; confronted those individuals and threatened reprisal if they attempted to rob the marijuana-distribution operation; continued his patrol by circling around the block and returning; and -- upon

discovering that the individuals had remained in the area -- confronted them a second time with an additional threat. Because "[p]rotecting . . . a narcotics conspiracy furthers the conspiracy's goal as much as selling narcotics does," the evidence that Peter took these actions -- combined with the evidence of his role in actual marijuana sales -- provided sufficient evidence of his guilt to sustain his conviction on Count One, even ignoring the additional incriminating actions that he (and his codefendants) demonstrably took in furtherance of the conspiracy on the night of the murder. United States v. Arrington, No. 15-CR-33-A, 2017 WL 6497625, at *9 (W.D.N.Y. Dec. 19, 2017).

While the pre-murder evidence of Jason Campbell's membership in the same marijuana conspiracy was somewhat less extensive, it was nonetheless sufficient on its own to support his Count One conviction.

The primary pre-murder evidence against Campbell stemmed from his conviction for criminal sale of marijuana in the fourth degree, which was admitted at trial pursuant to a stipulation between Campbell and the Government. The events underlying that conviction, which occurred on February 3, 2012 -- within the time period of the charged conspiracy and only months before the September 2012 attempted robbery of the stash house by Gray and Martinez -- are incriminating. As detailed *supra*, Campbell sold marijuana to an undercover officer half a block away from Streets's

3233 Olinville Avenue stash house; when the authorities returned to arrest him a short while later, they found him standing directly in front of the stash house, together with Streets, who was at that moment in possession of both a joint and "lose marijuana." Tr. at 435. Campbell thus dealt marijuana in the territory of a well-known marijuana-distribution organization, in direct proximity to its leader, with whom he immediately thereafter loitered at the organization's home base. Accordingly, the jury was directed to the straightforward inference that Campbell had been dealing marijuana out of the stash house, in concert -- rather than in competition -- with Streets, the brother of his friend Sean Peter.

Further evidence of Campbell's membership in the charged conspiracy came from Robinson's testimony that he would see Campbell hanging out with his codefendants, including Peter, inside the corner store out of which Peter and Streets would sell marijuana. Tr. at 461. "[A]lthough one's [mere] presence in a setting where a conspiracy is being conducted or discussed may not by itself connote participation, . . . [t]he circumstances under which one is present may imply involvement." United States v. Locascio, 6 F.3d 924, 944 (2d Cir. 1993). Here, "[t]he jury could . . . have reasonably determined that" Campbell's repeated presence in the store was at least probative of (albeit insufficient to alone establish) his membership in the conspiracy

because generally "only trusted members of [an] operation would be permitted" to regularly accompany its leaders as they transact its core illicit business. Id. at 945 (quoting United States v. Soto, 959 F.2d 1181, 1185 (2d Cir. 1992)). Viewing that evidence in the context of and otherwise together with the direct evidence of Campbell's marijuana dealing -- and certainly if the foregoing is coupled with the evidence of his activities on the night of the murder -- the jury's verdict of guilty on Count One as to Campbell was amply supported.

The pre-murder evidence of Steven Syder's membership in the marijuana conspiracy, meanwhile, was appreciably thinner than the evidence against either of his codefendants -- indeed, far too thin to alone support his Count One conviction. That evidence was limited to Syder's presence, from time to time, with Peter and Campbell in the corner store; it included no evidence that Syder actually participated in marijuana sales or otherwise furthered the goals of the conspiracy in any way. Syder's conviction thus depended on the jury viewing the evidence of his pre-murder experiences -- and any knowledge that could be inferred therefrom -- together with the concrete actions that he took in concert with Peter and Campbell on October 2, 2012. See United States v. Valle, 807 F.3d 508, 516 (2d Cir. 2015) ("[T]he prosecution's proof must be considered in relation to the rest of the evidence presented at trial, rather than in isolation."). The events of that night at

once provided additional evidence of each defendant's membership in the charged marijuana conspiracy -- evidence critical to Syder's guilt on Count One -- and sufficiently connected the firearm murder of Brian Gray to the work of that conspiracy to support each defendant's convictions on Counts Two and Three. See United States v. Plaza, 752 F. App'x 37, 41 (2d Cir. 2018) (explaining that the requirement in § 924(c)(1) -- and, in turn, § 924(j) -- of a connection to a drug crime "may be satisfied [simply] by a showing of some nexus between the [relevant] firearm [discharge] and the drug selling operation" (quoting United States v. Finley, 245 F.3d 199, 203 (2d Cir. 2001))).

The evidence of Gray's murder completed the story that began the night that Gray and Martinez attempted to rob Streets's stash house roughly two weeks earlier. The obvious link between the two events was laid bare for the jury: days after Peter caught Gray attempting the robbery, Peter's codefendant friends either spotted Gray by chance or deliberately located him and immediately thereafter joined up with Peter to stalk and execute him. Faced with this evidence, the defendants (led by Peter) argue that even insofar as the jury's acceptance of the foregoing narrative was reasonable (as the Court has found that it was), a reasonable jury still would have needed to entertain a reasonable doubt as to whether the murder was a response to the robbery attempt itself -- and thus designed to eliminate a threat (or discourage future

threats) to the marijuana conspiracy -- because it could have instead been a response to Martinez's attempt to shoot Peter -- and thus motivated by personal animus rather than drug-related business interests.[9]  This argument is fatally flawed in several respects.

As a threshold matter, the defendants appear to base this argument, among others they advance, on an imprecise framing of the standards that govern motions under Rule 29.  Throughout their briefing, the defendants repeatedly rely on the following proposition, which appears frequently in the caselaw of this circuit: "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."  E.g., United States v. Anderson, 747 F.3d 51, 60 (2d Cir. 2014).  But the defendants read this proposition for more than it is worth,

---

[9] To the extent that the defendants advance the alternative argument that the jury needed to accord meaningful weight to the possibility that the murder was a response to the robbery attempt and yet still personal in nature (as simple retaliation for Gray's and Martinez's aggression against Streets in his individual capacity), that argument is undermined -- decisively, for purposes of a Rule 29 motion -- by key facts in evidence.  Among them are the fact that, contrary to what an adherent of that narrative would expect, Streets appears to have had no involvement in the murder that the defendants would have had the jury believe was committed in retaliation for a wrong committed against him; the fact that, even if Peter's familial ties to Streets could account for his willingness to kill, there is little if any basis in the record for inferring a motive -- unrelated to business interests shared with Streets -- that would account for the willingness of Campbell and Syder to take such extreme measures, particularly without Streets even present; and other facts discussed infra as undermining the defendants' primary argument that the murder resulted from a personal dispute ignited when Martinez attempted to shoot Peter.

seemingly ignoring the first few words and suggesting that so long as the totality of the evidence can be said to support reasonable inferences on both sides, it is to be disregarded as insufficient to sustain a guilty verdict; thus, the defendants argue, because the murder could have been understood as a response to the robbery attempt *or* as a response to the shooting attempt, their convictions under Counts Two and Three must be set aside.  In reality, however, when a conviction is reviewed under Rule 29, the evidence is *viewed in the light most favorable to the prosecution*, and *only then* is it interrogated to determine whether it sufficiently supports a finding of guilt.

Here, "crediting every [reasonable] inference that could have been drawn in the government's favor," and deferring to the manner in which the jury evidently allocated weight to those inferences, Coplan, 703 F.3d at 62 (internal quotation marks omitted), there *was* sufficient evidence under the governing substantive law that the murder was a drug-related hit to support the relevant convictions beyond a reasonable doubt, see Thomas, 2018 WL 4006785, at *2 ("Even if there was an additional personal motivation for the murders, 'the government need only prove beyond a reasonable doubt that *one* motive for the killing . . . was related to the drug conspiracy.'" (second alteration and emphasis in original) (quoting Desinor, 525 F.3d at 202)); cf. United States v. Alston, 899 F.3d 135, 146 (2d Cir. 2018) (finding that while the defendant

contended that he possessed a gun in connection with a "social matter" rather than in furtherance of a drug crime, the jury could have found the requisite nexus with a narcotics conspiracy beyond a reasonable doubt). In other words, even accepting the defendants' contention that a reasonable jury *could* have understood the evidence to support their "innocent" explanation for the murder, this was at most a case "where either of the two results, a reasonable doubt or no reasonable doubt, [was] fairly possible," and in such a case, "[we] must let the jury decide the matter." United States v. Klein, 913 F.3d 73, 78 (2d Cir. 2019) (second alteration in original) (quoting Autuori, 212 F.3d at 114).

Turning to the specific facts that undermine the defendants' argument, it was certainly reasonable for the jury to infer from the defendants' targeting of Gray -- as opposed to *Martinez*, the individual who had actually attempted to shoot Peter -- that the murder was a response to the broader robbery attempt; indeed, the defendants had seen the victims minutes before the shooting and therefore knew that Martinez was not among them. This connection to the robbery also better accounted for the extensive involvement of Campbell and Syder in the murder, as those two defendants were *not* almost shot by Martinez (or, for that matter, Gray). Insofar as the defendants would have had the jury believe that Campbell and Syder were willing to commit a premeditated murder in furtherance of Peter's personal vendetta as a matter of friendship,

the absence of evidence in the record reflecting such a close social relationship between the defendants or an inclination shared by Campbell and Syder to take such extreme measures in the ordinary course of their personal lives renders that notion entirely speculative.[10] But it was wholly reasonable for the jury to instead infer, in light of the targeting of only Gray, that the defendants -- particularly the two who were shown through pre-murder evidence alone to have been members of the conspiracy that was run out the stash house that Gray had tried to rob -- killed (an act hardly aberrant in the drug business) to protect their livelihoods from past or future rivals. Cf. United States v. Santos, 541 F.3d 63, 72 (2d Cir. 2008) ("Because narcotics conspiracies are illicit ventures, disputes are frequently settled by force or the threat of force."). Focusing on Peter alone, the foregoing, coupled with the pre-murder evidence discussed *supra* -- including the evidence supporting the inference that he had previously served as protective muscle for the marijuana conspiracy -- was sufficient to support the jury's finding that the firearm murder of Gray "had the requisite nexus with . . . the narcotics conspiracy." Plaza, 752 F. App'x at 41.

---

[10] It bears noting that it would have been even more speculative for the jury to have presumed that Campbell or Syder had simply been hired by Peter to perform the murder on his personal behalf, given that absolutely no evidence suggested as much and considerable evidence supported an alternative explanation for their involvement.

Focusing on Campbell and Syder, ample additional evidence supported the jury's finding that their participation in the murder also shared that nexus with the conspiracy. Even if, as those defendants contend, any such finding was undermined by the absence of direct evidence that they were specifically told about Gray's attempt to rob the stash house, there still existed sufficient evidence -- including the evidence that it was *Campbell and Syder* who first identified Gray on the street and set in motion the events that culminated in his shooting -- for the jury to infer that they "knew that the murder[] [they] performed was in furtherance of the drug conspiracy." <u>United States v. Stewart</u>, 280 F. App'x 44, 46 (2d Cir. 2008).

At the outset, a reasonable jury could have attributed a material level of baseline knowledge to Campbell and Syder solely on the on the basis of the pre-murder evidence of their activities. That evidence supported a finding that Campbell was a member of the conspiracy who knew about the stash house that Peter had caught Gray attempting to rob; that Campbell and Peter would interface regularly, playing basketball together at the park and accompanying one another inside the store out of which (at least) Peter and Streets -- the operator of the stash house -- would sell marijuana; and that Syder would join his codefendants both on the basketball court and in the store. While Syder's association with members of the conspiracy and mere presence with them as they

conducted the conspiracy's core business could not, without more, support his conviction for any of the crimes charged, it is at a minimum probative of his knowledge of the conspiracy's existence and thus, in turn, the murder's context.  Cf. United States v. Atehortva, 17 F.3d 546, 551 (2d Cir. 1994) (deeming probative of the defendant's knowledge that the kidnapping he was hired to perform "involved narcotics" whether "drugs were discussed" during "pre-kidnapping meetings between" him and members of the narcotics conspiracy).

It is in light of this background evidence that the evidence of the murder itself took form before the jury.  Apart from the relative implausibility of an alternative explanation for Campbell's and Syder's participation in the murder -- which targeted an individual who had just recently been caught by their accomplice, Peter, trying to rob the conspiracy that all three defendants were either in or associated with -- the nature of their participation gave rise to an inference that they and Peter shared a common professional purpose.  Importantly, there was absolutely no indication that either Campbell or Syder was an "independent gunman," United States v. Garcia-Torres, 280 F.3d 1, 6 (1st Cir. 2002), "recruited by [Peter or any other member of the conspiracy] specifically to carry out" the murder as a discreet task disconnected from the broader operation, Atehortva, 17 F.3d at 551.  Instead, all three defendants operated as a unified

triumvirate, exhibiting a degree of methodical and enthusiastic collective action reflective of "informed and interested cooperation." United States v. Zambrano, 776 F.2d 1091, 1095 (2d Cir. 1985). From their initial scouting and group stalking, to their retrieval of firearms from a common stash, to their synchronized battle charge, to their return to a single safe house, to their re-stashing of their weapons together, to their joint flight with the evidence of their misdeeds, all the way through their coordinated lies to law enforcement -- their collaboration was seamless and their co-investment manifest. Far from a half-hearted or passive undertaking on the part of any defendant, the execution thus smacked of a joint business venture in which each defendant "had a stake." Id. (internal quotation marks omitted).

Further clothing the affiliation of Campbell and Syder and their connection to the murder in the trappings of a professional enterprise was their acknowledgment to law enforcement during the ensuing interrogations that they shared a single cellphone. While Campbell justifiably insists that "the fact that Mr. Campbell and Mr. Syder used the same phone . . . [did] not prove a conspiracy," ECF No. 119 at 16-17, it nonetheless supported the inference that they were trusted colleagues with common business interests. This in turn supported the inference that their joint participation in a murder sharing an obvious nexus with Campbell's marijuana

48

business was undertaken for business reasons and with neither walled off from that fact.

But undoubtedly the single piece of evidence most directly linking all three defendants' participation in the murder to the marijuana conspiracy was the black duffle bag with which the defendants fled the neighborhood after the shooting. That bag, which the defendants -- fresh off the shooting -- went to Peter's home to pack before leaving the Bronx together, contained, *inter alia*, a distribution quantity of marijuana, paraphernalia used for marijuana distribution, and the three kinds of ammunition (in either live or spent form) that the defendants had used in the shooting.[11] The significance of this evidence, which colors all of the evidence previously surveyed, can hardly be overstated.

The defendants' comingling of additional contraband with the ammunition unquestionably connected to all three of them in the single bag that they took with them on their joint flight supported the inference that they understood the bag's contents to be part of an integrated criminal enterprise. Indeed, the jury was free to infer from those facts that the defendants collectively

---

[11] As discussed *supra*, the contention of Campbell and Syder that the jury needed to hold them blameless for the bag asks too much. True, Peter was the individual who carried the bag into the van; but the circumstances and timing of its retrieval from Peter's home, its unfixed custody once the defendants entered the van (which Peter and Syder later exited, without the bag, at the hospital), and its contents -- namely, evidence of *each* defendant's participation in the murder -- together rendered fruitless any defendant's attempt at categorical dissociation and indeed supported an inference of shared responsibility.

endeavored to abscond not only with evidence directly linking them to the murder, but with evidence linking the murder to its basis: marijuana distribution. Moreover, the very introduction of distribution-quantity marijuana (which was visible in plain view and emitted a noticeable odor) into the events of the night certainly undermined any doubt that the jury may have otherwise harbored as to whether all three defendants were privy to the murder's connection to the conspiracy. Cf. Atehortva, 17 F.3d at 551 (deeming probative of the defendant's knowledge that the kidnapping he was hired to perform "involved narcotics" whether "drugs were . . . discussed in [his] presence" "after [the victim] had been kidnapped"). Considering this evidence together with, *inter alia*, the background knowledge and affiliations of the defendants, the close temporal proximity of the murder and Gray's thwarted robbery attempt, the targeting of Gray (as initiated by Campbell and Syder) rather than Martinez, the manifest level of trust that the defendants displayed in one another, the enthusiasm with which each of them participated in the murder, and the business-like synchronization of their plotting, execution, and flight, no more was needed to convince a reasonable jury not only that the defendants had murdered or aided and abetted the murder of Brian Gray by means of a firearm, but that each of them had done so with knowledge that the murder was connected to the marijuana conspiracy.

The consequences of that knowledge were profound. Because "membership in a conspiracy may [] be established [] by . . . proof of purposeful behavior aimed at furthering the goals of the conspiracy," United States v. Desimone, 119 F.3d 217, 223 (2d Cir. 1997), evidence of a defendant's knowing commission of a murder in furtherance of a drug conspiracy can suffice to establish "that the defendant was a member of the drug conspiracy in furtherance of which the killing was committed," even if "he was not involved in the . . . drug conspiracy before the day of the murder[]," Santos, 541 F.3d at 68-69. "Indeed, a single act [in furtherance of a conspiracy] may be enough to bring one within the membership of the conspiracy," United States v. Rosario, No. S2 14-CR-603 (VSB), 2017 WL 3841867, at *3 (S.D.N.Y. Sept. 1, 2017), and, no less than drug distribution itself, an act of "[v]iolence [such as a murder can] further[] [the goals of a drug] conspiracy . . . by sending the message that those suspected of stealing from the conspiracy w[ill] be treated harshly," Santos, 541 F.3d at 72 (internal quotation marks omitted). See, e.g., United States v. Gomez, 210 F. Supp. 2d 465, 470 (S.D.N.Y. 2002) (Chin, J.) ("[E]ven though a defendant is not involved in the actual distribution of narcotics, if he is a hitman and he is hired to hit someone to further the goals and operation of the conspiracy, he can be found to be a co-conspirator." (alterations and internal quotation marks omitted)); Arrington, 2017 WL 6497625, at *9 ("Protecting . . . a

51

narcotics conspiracy furthers the conspiracy's goal[s] as much as selling narcotics does."); <u>Ulbricht</u>, 31 F. Supp. 3d at 561 (noting that "a variety of conduct, apart from selling narcotics, can constitute participation in a conspiracy sufficient to sustain a conviction" and that "[t]here are numerous examples of participants in narcotics conspiracies who did not themselves intend physically to possess or distribute narcotics" (internal quotation marks omitted)).

For Peter and Campbell, whose membership in the conspiracy was sufficiently established through evidence of their pre-murder activities alone, the evidence that they went on to commit a firearm murder in furtherance of the conspiracy only bolstered the jury's adequately-supported finding that they were guilty of Count One, while simultaneously providing sufficient support for the jury's finding that they were also guilty of Counts Two and Three. But for Syder, whose pre-murder activities alone were not sufficient to establish his status as a coconspirator, the evidence that he knowingly linked up with members of the conspiracy to jointly commit a firearm murder in furtherance of the conspiracy provided necessary completion to an evidentiary picture that -- viewed in its totality -- was sufficient to support the jury's finding that he too was a member of the conspiracy and therefore guilty of Count One, as well as guilty of Counts Two and Three. <u>See</u> <u>Santos</u>, 541 F.3d at 73 ("That [the defendant] did not

participate in the narcotics conspiracy in some way other than carrying out the murder[] does not undermine the sufficiency of the evidence that he was a co-conspirator."). While a defendant's commission of a murder with knowledge of its aim of furthering the goals of a conspiracy would not in *all* "circumstances" justify the conclusion that he was a member of the conspiracy, that conclusion was "appropriate" in Syder's case. <u>Id.</u> at 69. Far from a hit performed by an "independent gunman" merely at the arm's-length direction of members of the conspiracy, Syder's participation in the murder was itself a seamlessly concerted act taken in lockstep with members of the conspiracy -- individuals with whom he was already affiliated. <u>Garcia-Torres</u>, 280 F.3d at 6. Nor was Syder by any means a passive participant merely along for the ride; on the contrary, from the moment that (according to surveillance footage) *he* first located Gray on behalf of the group and thereby set the murder into motion to the moment that (according to Bettis) *he* led the final battle charge and fired the murder's first shot on behalf of the group, Syder "exhibited [the sort] of 'interested cooperation, stimulation, and instigation' that would permit [a] jury to infer the 'intent and agreement necessary to sustain a conspiracy charge.'" <u>Santos</u>, 541 F.3d at 73 (quoting <u>Zambrano</u>, 776 F.2d at 1095). "Although, as [Syder] argues, a reasonable juror may have reached a contrary conclusion, such matters [were] appropriately argued to the jury and are not grounds for [relief

from a verdict]." Id. (first alteration and internal quotation marks omitted).

\*                  \*                  \*

Accordingly, the Court is satisfied that sufficient evidence supported the jury's verdict of guilty as to all three defendants on all three crimes charged.

## III. Conclusion

For the foregoing reasons, the defendants' motions under both Rule 29 and Rule 33 are denied in their entirety.

**SO ORDERED.**

Dated:      New York, New York
            July 8, 2019

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE